RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 19a0210p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

APRIL MILLER; KAREN ANN ROBERTS; SHANTEL BURKE;
STEPHEN NAPIER; JODY FERNANDEZ; KEVIN HOLLOWAY; L.
AARON SKAGGS; BARRY W. SPARTMAN,

*Plaintiffs-Appellees*,

*v.*

Nos. 17-6385/6404

ELWOOD CAUDILL, JR., in his official capacity as Rowan
County Clerk,

*Defendant-Appellee/Cross-Appellant*,

ROWAN COUNTY, KENTUCKY,

*Defendant-Appellee*,

MATTHEW G. BEVIN, in his official capacity as Governor of
Kentucky; TERRY MANUEL, in his official capacity as State
Librarian and Commissioner of the Kentucky Department for
Libraries and Archives,

*Third Party/Defendants-Appellants/Cross-Appellees.*

Appeal from the United States District Court
for the Eastern District of Kentucky at Ashland.
No. 0:15-cv-00044—David L. Bunning, District Judge.

Argued:  January 31, 2019

Decided and Filed:  August 23, 2019

Before:  GRIFFIN, WHITE, and BUSH, Circuit Judges.

---

## COUNSEL

**ARGUED:**  Palmer G. Vance, II, STOLL KEENON OGDEN, PLLC, Lexington, Kentucky, for
Matthew G. Bevin and Terry Manuel.   William E. Sharp, BLACKBURN DOMENE &

BURCHETT, PLLC, Louisville, Kentucky, for April Miller, et al.  Roger K. Gannam, LIBERTY COUNSEL, Orlando, Florida, for Elwood Caudill, Jr.  **ON BRIEF:**  Palmer G. Vance, II, William M. Lear, Jr., STOLL KEENON OGDEN, PLLC, Lexington, Kentucky, for Matthew G. Bevin and Terry Manuel.  William E. Sharp, BLACKBURN DOMENE & BURCHETT, PLLC, Louisville, Kentucky, James D. Esseks, Ria Tabacco Mar, Daniel Mach, Heather L. Weaver, AMERICAN CIVIL LIBERTIES UNION FOUNDATION, New York, New York, Daniel J. Canon, Laura E. Landenwich, CLAY DANIEL WALTON & ADAMS, Louisville, Kentucky, Amy D. Cubbage, ACLU OF KENTUCKY, Louisville, Kentucky, for April Miller, et al.  Roger K. Gannam, Mathew D. Staver, Horatio G. Mihet, Kristina J. Wenberg, LIBERTY COUNSEL, Orlando, Florida, for Elwood Caudill, Jr.  Jeffrey C. Mando, ADAMS, STEPNER, WOLTERMANN & DUSING, PLLC, Covington, Kentucky, for Rowan County.

———————————

**OPINION**

———————————

GRIFFIN, Circuit Judge.

Under the "American Rule," parties typically pay their own attorney's fees.  Congress created an exception, though, for plaintiffs who win cases against government officials over civil-rights violations.  Here, plaintiffs applied for marriage licenses only to find that Kim Davis, who oversaw marriage licensing for Rowan County, Kentucky, wouldn't issue them.  So they sued her for infringing their constitutional right to marry, and the district court ordered Davis to give them what they wanted.  Once they obtained licenses (or chose not to seek them again), they chose not to pursue the lawsuit any further.  But they did pursue attorney's fees, which the district court awarded and required the Commonwealth of Kentucky to pay.  The Commonwealth, Rowan County, and the official who replaced Davis now contend that plaintiffs didn't win and thus can't recover attorney's fees.  They also dispute who must pay the fee award.  And Davis's successor challenges the amount of the award.  We reject all the issues the parties raise on appeal and therefore affirm.

I.

In the summer of 2015, Kim Davis was the County Clerk for Rowan County, Kentucky. One of her responsibilities was to issue marriage licenses.  But same-sex marriage offended her religious beliefs, so when the Supreme Court recognized a constitutional right to same-sex

marriage in *Obergefell v. Hodges*, 135 S. Ct. 2584 (2015), Davis took matters into her own hands.

One day after the Supreme Court released *Obergefell*, Davis stopped issuing marriage licenses. She didn't discriminate against same-sex couples, though; she stopped issuing licenses altogether. That meant that when plaintiffs—two same-sex couples and two different-sex couples who lived in Rowan County—sought marriage licenses from the Clerk's Office, they couldn't get them.

With a constitutional right to marry yet no ability to obtain marriage licenses within Rowan County, plaintiffs sued Rowan County and Davis, in her individual capacity and in her official capacity as County Clerk. They sought injunctive relief, a declaratory judgment, and damages.

Plaintiffs promptly moved for a preliminary injunction. The district court granted the motion, enjoining Davis from enforcing her policy against plaintiffs. Davis asked our court and the Supreme Court to stay the injunction, but she didn't prevail. *Davis v. Miller*, 136 S. Ct. 23 (2015); *Miller v. Davis*, No. 15-5880, 2015 WL 10692640 (6th Cir. Aug. 26, 2015).

The morning after the Supreme Court rejected her request for a stay, Davis decided to resist the injunction, so she told her deputy clerks to continue enforcing her no-license policy. Two of the plaintiffs again sought a marriage license but were rebuffed. Plaintiffs then moved for the district court to hold Davis in contempt of the injunction and to expand the injunction's scope to prevent Davis from enforcing her policy against other couples. The district court did both. And after Davis's deputy clerks told the court they would issue marriage licenses, the court gave Davis a second chance: if she would agree not to interfere with her deputy clerks' compliance with the injunction, she wouldn't be sent to jail. Davis chose jail.

While Davis was in custody, two plaintiffs decided not to seek a marriage license again, six others sought and received them, and four of those six used them to wed. After learning of plaintiffs' successes, the district court lifted the contempt sanction and released Davis from custody. It also ordered her to refrain from interfering with her deputy clerks as they issued licenses.

In addition to fighting the case against her, Davis brought a case of her own. She filed a third-party complaint against the then-Governor of Kentucky, Steven Beshear, and the then-Commissioner of Kentucky's Department of Libraries and Archives, Wayne Onskt ("Kentucky Officials"). She opposed same-sex marriage on religious grounds—the marriage licenses she issued had her name on them, and she felt that her name's appearance was the equivalent of her personal endorsement—so she sought a preliminary injunction requiring the Kentucky Officials to exempt her from having to issue marriage licenses.

In response to Davis's lawsuit, Governor Matthew Bevin, who had succeeded Beshear, issued an executive order establishing a revised marriage license that didn't contain the names of county clerks. The Kentucky General Assembly also amended Kentucky law so that county clerks weren't required to sign marriage licenses. *See* 2016 Kentucky Laws Ch. 132 (SB 216), General Assembly Reg. Sess. (Ky. 2016).

Those changes appeased Davis, so she asked us to dismiss the various appeals then pending in our court. We granted her request and instructed the district court to vacate its preliminary injunction. *Miller v. Davis*, 667 F. App'x 537, 538 (6th Cir. 2016). On remand, the district court followed our instructions and also dismissed plaintiffs' damages claims *sua sponte*.

Plaintiffs chose not to appeal the dismissal of their damages claims, but they sought attorney's fees under 42 U.S.C. § 1988. The district court awarded plaintiffs $222,695.00, but it imposed liability on the Commonwealth, not the Clerk's Office or Rowan County. That prompted the Kentucky Officials, who hadn't responded to plaintiffs' motion for fees, to ask the district court to amend its ruling to assess fees against the Clerk's Office. The district court refused.

The Kentucky Officials and Davis appealed the fee award. After the parties submitted their briefs, Elwood Caudill, Jr. replaced Davis as Rowan County Clerk and thus as a defendant, appellee, and cross-appellant in this case. He adopted her arguments, so we will refer to them as his.

II.

The common law contains no right to attorney's fees for the winning party to a lawsuit. *McQueary v. Conway*, 614 F.3d 591, 596 (6th Cir. 2010).  Instead, under what is known as the "American Rule," each party pays his, her, or its own fees unless a statute explicitly provides otherwise.  *Buckhannon Bd. & Care Home v. W. Va. Dep't of Health and Human Res.*, 532 U.S. 598, 602 (2001).  Here, 42. U.S.C. § 1988 provides otherwise:

> In any action or proceeding to enforce a provision of . . . [§] 1983 . . ., the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee . . . .

42 U.S.C. § 1988(b).

Whether plaintiffs may obtain attorney's fees, then, hinges on whether they prevailed. Caudill and the Kentucky Officials say they didn't; plaintiffs say they did.  And if they did, Caudill and the Kentucky Officials also argue over who must pay the award—Caudill points to the Commonwealth; the Commonwealth (by way of the Kentucky Officials) points back. Caudill, alone, challenges the amount of the award as well.  We address each issue in turn.

A.

As an initial matter, we must resolve a split in our caselaw over how we review a district court's determination of whether a party is a "prevailing party" under § 1988.  Sometimes we've reviewed for clear error.  *See, e.g.*, *DiLaura v. Twp. of Ann Arbor*, 471 F.3d 666, 670 (6th Cir. 2006).  Other times we've reviewed de novo.  *See, e.g.*, *Radvansky v. City of Olmsted Falls*, 496 F.3d 609, 619 (6th Cir. 2007).  And when our published opinions conflict, the earliest opinion normally controls because one panel can't overturn another's decision.  *Ne. Ohio Coal. for the Homeless v. Husted*, 837 F.3d 612, 630 (6th Cir. 2016).  Indeed, published precedent binds all future panels unless (1) we overrule it as an en banc court or (2) it conflicts with intervening United States Supreme Court precedent and thus requires modification.  *Id.*

Our caselaw reviewing for clear error appears to have begun with *Citizens Coalition for Block Grant Compliance, Inc. v. Euclid*, 717 F.2d 964, 967 (6th Cir. 1983), and our caselaw

reviewing de novo appears to have begun with *Radvansky*.[1]  But in *Sole v. Wyner*, the Supreme Court considered whether a party was a "prevailing" one under § 1988 and reviewed the question de novo. 551 U.S. 74, 81–86 (2007).  *Sole* thus abrogated *Euclid* and our later decisions following *Euclid*'s approach, which means *Radvansky* controls.  Applying *Radvansky*, we therefore hold that whether plaintiffs prevailed is an issue we review de novo.

With that standard in mind, we turn to the merits.  The district court issued a preliminary injunction (a temporary order that holds things in place until the court or a jury decides the case) and shortly thereafter dismissed the case as moot, so that injunction was all plaintiffs got.  In such scenarios, we apply a case-specific inquiry, which we approach with both hesitancy and skepticism because the "'preliminary' nature of the relief . . . generally counsel[s] against fees in the context of preliminary injunctions." *McQueary*, 614 F.3d at 601.  And we look for a court-ordered, material, enduring change in the legal relationship between the parties.  *Id*. at 597–98.

A few aspects of this inquiry warrant further elaboration.  First, for the change to have been *court ordered*, the preliminary injunction must have caused it; it can't stem from Davis's voluntary modification of her conduct.  *Id*. at 597.  Second, for the change to have been *material*, it must have directly benefited plaintiffs by altering how Davis treated them.  *Id*. at 598.  And third, for the change to have been *enduring*, it must have been irrevocable, meaning it must have provided plaintiffs with everything they asked for.  *Id*. at 597, 599.

Some examples help make the abstract concrete.  "When protesters seek an injunction to exercise their First Amendment rights at a specific time and place—say to demonstrate at a Saturday parade—a preliminary injunction will give them all the court-ordered relief they need and the end of the parade will moot the case." *Id*. at 599.  "The same is true of a government employee who seeks to exclude an unconstitutionally obtained report from an administrative hearing and obtains a preliminary injunction that irrevocably excludes the report." *Id*.  "So also for a plaintiff who seeks to delay enforcement of a statute until a certain event occurs—say a scheduled public referendum—and the preliminary injunction brings about that result." *Id*.

---

[1]In *Toms v. Taft*, 338 F.3d 519, 528–30 (6th Cir. 2003), this court applied de novo review without explicitly stating the standard of review.

Here, what happened doesn't fit neatly into those examples. Plaintiffs, unlike the hypothetical protesters, government employee, and public-referendum enthusiast, didn't seek relief specific to a time and place. But that's a distinction without a difference because (1) Kentucky marriage licenses give couples a 30-day window in which to wed, Ky. Rev. Stat. § 402.105, (2) couples can obtain licenses at any time, and (3) those licenses are one-time things for all but the dilatory or wishy-washy. Put differently, plaintiffs needed only the *opportunity* to obtain marriage licenses because Kentucky law left the rest to their discretion; with licenses in hand, plaintiffs could choose the time and place to wed.

The preliminary injunction, then, rendered plaintiffs prevailing parties. Their relationship with Davis was one of licensee and licensor. Before the injunction, Davis refused to issue marriage licenses, but the injunction required her to. Thus, Davis went from an unwilling licensor to a compulsory one, while plaintiffs went from unsuccessful licensees to successful ones. So the change was *court ordered*. Under the injunction, plaintiffs could obtain marriage licenses—a direct benefit if there ever was one. So the change was *material*. And once plaintiffs secured the marriage licenses Davis had denied them, Davis could no longer control whether they tied the knot. So the change was *enduring*. In short, the injunction gave plaintiffs all the court-ordered relief they needed, and the issuance of the marriage licenses mooted their request for them. *See McQueary*, 614 F.3d at 600.

Caudill and the Kentucky Officials dispute that conclusion, but we find their arguments unpersuasive. They contend that plaintiffs didn't prevail because two of them never obtained a marriage license and two others never wed. But a decision not to reap the benefits of victory doesn't transform victory into defeat. Consider the first *McQueary* example: the protestors seeking to demonstrate at a parade. *Id*. at 599. If a preliminary injunction allowed them to demonstrate but they opted instead for a long brunch, would they be any less of prevailing parties than if they had demonstrated? We think not. The injunction would still give them all the court-ordered relief they need, and the end of the parade would still moot the case— regardless of where they were when the crowds dispersed and the streets reopened.

Another argument the Kentucky Officials advance rests on the preliminary injunction's fleeting existence. After the district court vacated the injunction, they argue, Davis could've

reinstated her policy, so the change plaintiffs secured wasn't enduring. But Davis couldn't have applied her policy retroactively to nullify the marriage licenses plaintiff had already obtained (or had the opportunity to obtain but chose not to). So she could do nothing to alter the relief that the injunction provided them; once they could obtain licenses, it was game over.

Then there is the Kentucky legislature's alteration of the marriage-license form, which convinced Davis to abandon her policy, and which Caudill and the Kentucky Officials contend shows that the relief plaintiffs received flows from a voluntary change rather than a court-ordered one. By the time that alteration occurred and Davis had a change of heart, however, plaintiffs had already obtained marriage licenses or had chosen not to seek them. The relief plaintiffs obtained—the unobstructed opportunity to secure pre-alteration marriage licenses—therefore stemmed from the preliminary injunction, not from the legislature's or Davis's later voluntary actions. Consider again the example of the parade protestors. *See McQueary*, 614 F.3d at 599. An injunction gives them the relief they need. *Id*. The parade's end moots the case. *Id*. And that's true regardless of whether the enjoined party (perhaps a local government with a no-demonstration ordinance) later decides to allow demonstration at future parades.

Finally, Caudill and the Kentucky Officials point to the complaint's broad prayer for relief, which requested far more than the injunction plaintiffs obtained. To be sure, plaintiffs sought other forms of relief—including a permanent injunction, a declaratory judgment, damages, and more. But everything they sought arose from Davis's refusal to issue marriage licenses; they brought the same claim in multiple forms. And, as discussed above, they succeeded on that claim. A win is a win—regardless of whether the winner runs up the score. To prevail, then, plaintiffs didn't need to obtain duplicative relief in every form that they originally sought it. They wanted the opportunity to obtain marriage licenses in Rowan County, and the preliminary injunction gave them exactly that.

As the district court put it, "[p]laintiffs did not achieve 'only a symbolic victory'"; "[they] won the war." They prevailed, and because they prevailed, they're eligible to recover attorney's fees under § 1988.

B.

So plaintiffs should recover their attorney's fees. But who must pay them? The logical answer is the party against whom they prevailed. The district court enjoined Davis in her official capacity as Rowan County Clerk (a role Caudill now plays). Must Caudill therefore pay the fee award out of the funds he or the Clerk's Office controls? Not necessarily.

In *Hutto v. Finney*, when determining who had to pay an attorney's-fees award under § 1988, the Supreme Court adopted a binary choice: either "the official, in his official capacity," pays the fees "from funds of his agency or under his control" or "the State or local government" pays them. 437 U.S. 678, 700 (1978). That is so regardless of whether the government is a party to the lawsuit because "suits brought against individual officers for injunctive relief are for all practical purposes suits against the State itself." *Id.* Thus, *Hutto*'s binary tells us that liability for the fees here could fall to the Rowan County Clerk's Office, Rowan County, or the Commonwealth of Kentucky. But *Hutto* doesn't tell us how to choose between those options; the *Hutto* Court faced a choice between individual officers or the government they served, so the Court never determined when and how liability could shift amongst *three* possible parties. *Id.*

In the absence of guidance on when to shift liability up the chain, the district court looked to the entity on whose behalf Davis acted when issuing or refusing to issue marriage licenses. And to decide which entity that was, the court invoked the six-factor test we developed in *Crabbs v. Scott*, 786 F.3d 426 (6th Cir. 2015)—a test we ordinarily use to determine whether a defendant is a state or local official for purposes of sovereign immunity. *Id.* at 429. Those six factors are: "(1) the State's potential liability for a judgment; (2) how state statutes and courts refer to the officer; (3) who appoints the officer; (4) who pays the officer; (5) the degree of state control over the officer; and (6) whether the functions involved fall within the traditional purview of state or local government." *Id.*

We agree with that approach and therefore adopt it, with one modification. Because official-capacity lawsuits seeking injunctive relief are effectively lawsuits against the government, *Hutto*, 437 U.S. at 700, which government an official serves determines which government a plaintiff prevails against. And when an official serves more than one government, the inquiry turns on which government the official served when taking the challenged action.

But the first *Crabbs* factor, in this context, is self-referential:  it asks about the State's liability for the fee award, which is the very question we are invoking the *Crabbs* test to answer. So we adopt a modified *Crabbs* test—one that doesn't include the first factor.

Here, application of the modified *Crabbs* test shows that Davis acted on Kentucky's behalf when she issued and refused to issue marriage licenses.  The fourth *Crabbs* factor is the easiest to analyze, so we begin there.   It is neutral because neither the Commonwealth nor Rowan County pays Davis's salary; the Clerk's Office pays its own expenses—including Davis's salary—with the fees it collects.

The second and third *Crabbs* factors, to be sure, suggest that Davis acted on the County's behalf.   The Kentucky Constitution refers to clerks as county officials.   Ky. Const. § 99. Kentucky courts have also generally characterized county clerks as county officials.  *See, e.g.*, *Carroll v. Reed*, 425 S.W.3d 921, 924 (Ky. Ct. App. 2014); *St. Matthews Fire Prot. Dist. v. Aubrey*, 304 S.W.3d 56, 60 (Ky. Ct. App. 2009).  County residents elect county clerks.  Ky. Const. § 99.  And if there is a vacancy, a county judge or executive appoints a new clerk.  Ky. Rev. Stat. § 63.220.   But these factors offer little help because they pertain to county clerks generally, and no party contests that county clerks mostly work on the behalf of counties—hence the title *county* clerk.  What we need is legal authority specific to marriage licensing.

The fifth and sixth factors give us that authority, and they are dispositive.  Only Kentucky can discipline county clerks.  *See* Ky. Const. § 68; Ky. Rev. Stat. §§ 402.990(6), 522.020–030; *Lowe v. Commonwealth*, 60 Ky. 237 (Ky. 1860).  And Kentucky has "absolute jurisdiction over the regulation of the institution of marriage." *Pinkhasov v. Petocz*, 331 S.W.3d 285, 291 (Ky. Ct. App. 2011).  Indeed, Kentucky law governs everything about marriage.  It defines marriage and sets eligibility requirements.  Ky. Rev. Stat. §§ 402.005, 402.010, 402.020.  It vests courts with the authority to declare certain marriages void.  *Id*. at § 402.030.   It describes who may solemnize a marriage and requires a couple to obtain a marriage license prior to marrying.  *Id*. at §§ 402.050, 402.080.  It sets out the process for licensing and recording a marriage.  *Id*. at §§ 402.100–402.240.  And specific to Davis, Kentucky law vests county clerks with the duty of issuing marriage licenses, recording marriage certificates, and reporting marriages.  *Id*. at §§ 402.080, 402.220, 402.230.  So Kentucky controls every aspect of how county clerks issue

marriage licenses; Rowan County has no say whatsoever.  That means we can rule out the County as an entity the could be liable for the fee award.  Because plaintiffs secured a preliminary injunction dictating how Davis wielded authority that Kentucky law granted her, they prevailed against her in her capacity as a State official, not a county one.

But what about Caudill?  The Kentucky Officials and plaintiffs would have us impose liability on the Clerk's Office—in other words, on Caudill in his official capacity—because, they claim, Davis created a discretionary policy specific to her office.  We disagree with that characterization.  Such an argument conflates discretion with insubordination.  Kentucky *required* Davis to issue marriage licenses to eligible couples.  *See, e.g.*, Ky. Rev. Stat. § 402.100 ("Each county clerk *shall make available* to the public the form prescribed by the Department for Libraries and Archives for the issuance of a marriage license.") (emphasis added); *id*. at § 402.110 ("In issuing the license the clerk *shall deliver* it in its entirety to the licensee." (emphasis added)); *id*. at § 402.080 (2017) ("The license *shall be issued by* the clerk of the county in which the female resides at the time, unless the female is eighteen (18) years of age or over or a widow, and the license is issued on her application in person or by writing signed by her, in which case it may be issued by any county clerk.") (emphasis added).  The parties have cited no authority suggesting that if a county official acting on the State's behalf fails to do a job the State requires her to do, that failure creates and confers discretion the State never gave her.  Davis's refusal to issue licenses, then, doesn't mean she acted on behalf of the Clerk's Office.  And that means that Caudill, in his official capacity, isn't liable for the fee award.

The Kentucky Officials also argue that "special circumstances" warrant not holding the Commonwealth liable for the award because its high-ranking officials acted in good faith and opposed what Davis did.  As we reaffirmed in *McQueary*, however, acting in good faith isn't a special circumstance justifying a denial of fees.  614 F.3d at 604.

Thus, because Davis acted on Kentucky's behalf when issuing and refusing to issue marriage licenses, the district court correctly imposed liability for the award on the Commonwealth.

C.

Caudill, alone, also challenges the attorney's-fees amount. We review that portion of the district court's ruling for an abuse of discretion, *Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 551 (6th Cir. 2008), which occurs when the district court relies on clearly erroneous factual findings, applies the law improperly, or uses an erroneous legal standard, *Wikol ex rel. Wikol v. Birmingham Pub. Schs. Bd. of Educ.*, 360 F.3d 604, 611 (6th Cir. 2004).

To calculate how much an award should be, courts in our Circuit use the "lodestar" method. *Geier v. Sundquist*, 372 F.3d 784, 791 (6th Cir. 2004). It has three steps. *Id.* First, a court multiplies a reasonable hourly rate for each attorney who represented the prevailing party by the number of hours that attorney worked on the case. *Id.* This creates a total amount of fees that each attorney generated. *Id.* Next, the court adds together those total amounts to get a grand total—the lodestar amount—of what it cost the prevailing party to win. *Id.* This amount then anchors the last step by giving the court a starting number for the award, after which the court evaluates the case's unique aspects to determine whether to adjust the award. *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983); *Adcock-Ladd v. Sec'y of Treasury*, 227 F.3d 343, 349 (6th Cir. 2000).

A party seeking fees must justify the amount of its request. *Reed v. Rhodes*, 179 F.3d 453, 472 (6th Cir. 1999). This burden requires evidence specific to the number of hours each attorney worked and the appropriate hourly rate for that work. *Hensley*, 461 U.S. at 433. In the absence of such evidence, a district court may reduce the award. *Id.*

Here, the district court correctly applied those standards. Nobody challenged the reasonableness of plaintiffs' counsel's billing rates, but the district court analyzed it anyway. The district court also inspected the time entries each attorney submitted and excluded as unreasonable those for clerical tasks or in block-billing format (where an attorney groups together multiple tasks without specifying how much time each task took). This produced a lodestar amount of $222,695.00.

In response to Davis's argument that plaintiffs' failure to obtain more than a preliminary injunction warranted slashing the lodestar amount by 75%, the district court then considered

whether to reduce the award. It emphasized that a prevailing plaintiff may recover fees for legal services relating to unsuccessful claims. The determining factor, said the court, was whether the unsuccessful claims related to the successful one. If so, plaintiffs could recover the entirety of their fees; if not, they couldn't. Because a common core of facts—Davis's refusal to issue marriage licenses—underpinned everything plaintiffs originally asked for, the district court held that the claims were related. So the district court awarded the full lodestar amount.

On appeal, Caudill claims as Davis did below that plaintiffs' failure to obtain more than a preliminary injunction means we should cut the award by 75%. But he never argues that the district court made clearly erroneous factual findings, applied the law improperly, or used an erroneous legal standard—the hallmarks of an abuse of discretion. Without a showing of one of those three errors, we will not overturn the award. When a district court gives clear and concise reasons for its award, we give the award substantial deference. *Hensley*, 461 U.S. at 437. The district court gave us an excellent explanation for the award amount, so we defer to its well-reasoned decision.

## III.

For these reasons, we affirm the district court's attorney's-fees award.